Charles NELOMS, Sammie Taylor, Arthur Henry and Ronald McKeel, Individually and on behalf of all others similarly situated, Plaintiffs,

Equal Employment Opportunity Commission, Intervenor,

v.

SOUTHWESTERN ELECTRIC POWER COMPANY, Local No. 329, International Brotherhood of Electrical Workers, AFL–CIO, Defendants.

Civ. A. No. 74–613.

United States District Court,
W. D. Louisiana,
Shreveport Division.

Nov. 23, 1977.

Frank E. Brown, Jr., Robert E. Piper, Jr., Piper & Brown, Shreveport, La., for plaintiffs.

Abner E. Sibal, James E. Miller, Charles L. Thomas, Equal Employment Opportunity Commission, Washington, D.C., for intervenor EEOC.

Arthur R. Carmody, Jr., Wilkinson, Carmody & Peatross, Shreveport, La., for defendant SWEPCO.

James A. Burnett, Burnett, Sutton, Walker & Callaway, Shreveport, La., for defendant IBEW Local No. 329.

William F. Banta, Kullman, Lang, Inman & Bee, New Orleans, La., co-counsel.

## OPINION

STAGG, District Judge.

On September 21, 1977, the Court ruled on the claims of the named plaintiffs and the intervenor against Local No. 329 of the International Brotherhood of Electrical Workers. This opinion decides the remaining issues still under advisement.

### PROCEDURAL HISTORY

The named plaintiffs, Charles Neloms, Sammie Taylor, Arthur Lee Henry and Ronald McKeel, filed this action on June 18, 1974, on behalf of themselves and all black citizens and residents of Shreveport who were or had been employed or had applied or might have applied for employment at Southwestern Electric Power Company (SWEPCO). They sought backpay and other equitable relief against SWEPCO. On March 17, 1975, Robert O. Moore moved to intervene as a plaintiff. The Court denied his intervention in a ruling on several motions on April 21, 1976. On September 20, 1976, the Equal Employment Opportunity Commission (EEOC) moved to intervene in the action. The Court allowed the EEOC to intervene, over SWEPCO's bitter objection, on November 22, 1976.

On April 9, 1975, the named plaintiffs moved the Court to certify the action as a class action. They sought to represent several sub-classes: (a) blacks employed at SWEPCO plants and members of IBEW Local 329; (b) blacks who applied for employment at SWEPCO and who were rejected; and (c) blacks who might have applied for jobs at SWEPCO but for the discriminatory. reputation of the Company. The Court approved the class action against SWEPCO on April 21, 1976, limiting membership in the class to black employees and applicants for employment at SWEPCO's Louisiana operations. Specifically, the Court defined the class as all blacks presently employed at SWEPCO, all blacks who had been discharged, and all blacks who had applied for employment at SWEPCO. The Court later interpreted the ruling to limit the class to black persons who had been employed or discharged, or who had applied for employment at SWEPCO's Louisiana Division. The named plaintiffs propounded notice to the members of the class according to an order of the Court of September 10, 1976.

After several pretrial motions, the Court set the case for pretrial and trial. After filing a pretrial order on March 4, 1977, the parties came to trial on March 21, 1977, without a jury. During the trial, the Court refused to dismiss the action at the close of plaintiffs' case and at the close of the trial the Court took its decision under advisement. On April 6, 1977, the Court fixed the briefing schedule for the parties.

### FINDINGS OF FACT

1. The complainants are black male citizens of Shreveport, Louisiana. Charles Neloms is a black former employee of SWEPCO who filed a charge of employment discrimination with the EEOC on November 2, 1973, and received a right-to-sue letter on March 21, 1974. Ronald McKeel is a black employee at SWEPCO who also filed a charge of employment discrimination with the EEOC against SWEPCO on November 2, 1973. He received a right-to-sue letter on June 11, 1974. Sammie Taylor is a black man who was employed by SWEPCO at the time the suit was filed, but who now has been discharged. He filed a charge of discrimination with the EEOC on November 12, 1973, and received his right-to-sue letter on June 11, 1974. Arthur Lee Henry was an unsuccessful black applicant for employment at SWEPCO. Like Mr. Taylor, Mr. Henry filed a charge of discrimination with the EEOC against SWEPCO on November 12, 1973, and received his right-to-sue letter on June 11, 1974.

2. Plaintiff-intervenor, EEOC, is an agency of the United States Government charged with the enforcement of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

3. SWEPCO is a corporation organized under the laws of Delaware, doing business in Louisiana and other states. The Company produces and supplies electricity and electric utility service in northwest Louisiana, northeast Texas and western Arkansas. It maintains and operates power plants, substations, transmission lines, office buildings and other facilities in an area of approximately 25,000 square miles in Louisiana, Texas and Arkansas.

4. At all times material to the lawsuit, SWEPCO employed at least 25 persons. In its answer it admitted that it was an "employer" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

5. Applicants for employment at SWEPCO apply through the personnel office or through a supervisor, who sends the applicant to the personnel office. The staff at the personnel office interviews the applicant and assists him in completing his application. If an opening occurs, the Company considers the applicant for employment.

6. Because the Company supplies and services an invisible and lethal energy source, SWEPCO's employment needs are somewhat unique. The Company maintains a standard of selectivity to fulfill its obligation to its customers and employees to operate safely. The Company seeks employees who will advance successfully from meter reader and other entry level jobs to more responsible positions. The major department head in the department where an opening exists decides whether to hire a particular individual. He relies heavily on the advice of the first line supervisor.

7. In most instances, SWEPCO requires new employees to have a high school diploma. The Company instituted the diploma requirement in 1956 to promote safety and efficiency. It has found significant differences in the performance of employees who were hired prior to 1956 without a high school diploma and that of those who were hired after 1956 with a high school diploma. The Company may waive the diploma requirement.

8. On its employment application, the Company inquires whether the applicant has relatives employed by SWEPCO. Company policy forbids employing husbands and wives. In addition, SWEPCO hesitates to place employees under the direct supervision of one of their relatives. White and black employees have relatives on the payroll at SWEPCO. Although there was some testimony to the contrary, the Court concludes that the Company never has refused to hire a black applicant because he had a relative who was an incumbent employee.

9. SWEPCO requires some applicants for employment to take and pass tests to enter some classifications, especially in the clerical area. In addition, the Company administers tests in some manual classifications, but the tests are not a basis for promotion or employment; the Company is attempting to obtain experience with the tests in order to validate them. The basic test the Company gives is the transmission and distribution ("T and D") test. The professional name of the test is the SRA Mechanical Aptitude and Mechanical Aptitude with Mechanical Reasoning test. It includes a battery of examinations to test mechanical knowledge, space relations, shop arithmetic, and mechanical reasoning. The Company does not observe a cutoff point for black employees who take the "T and D" test.

10. In the clerical section, which includes the classification meter reader, prospective employees are given a two-part test, the Short Employment Test (SET). The SET is the only test administered since the effective date of Title VII for which the Company has required a passing score of both blacks and whites. The SET was developed by The Psychological Corporation. It has three parts, an arithmetic part, a credit rating part, and a vocabulary part. Employees must pass either the arithmetic or the credit rating part in order to be hired

as meter readers. The arithmetic part deals with simple arithmetic functions, and the credit rating part deals with transposing numbers from one position to another position accurately.

11. All of the tests used at SWEPCO have been developed professionally. The Company has made no formal attempt to validate any of the tests that it uses as racially neutral. In addition, no test used by the Company has been sanctioned by the EEOC.

12. Several blacks hired by SWEPCO are employed in the service area. Some of them are janitors. Charles Provenza, employment supervisor for SWEPCO, testified that many of them came to him asking to be janitors so that they could work at night and continue to hold their day jobs. The Company maintains an annual review and evaluation system. Mr. Provenza stated that the records reflected that most of the men in janitorial positions were happy with their jobs and did not wish to transfer to other departments.

13. On a typical route to journeyman lineman, a lucrative position with SWEP-CO, an employee normally progresses from an entry level position such as garage attendant, then to warehouseman, then to lineman's helper, then to truck driver, then to apprentice lineman, then to lineman. The "line of progression" is not formalized in the collective bargaining agreement, according to the testimony. Some persons have become linemen without taking all the steps in the progression. Indeed, some persons have become lineman's helpers by being hired first as garage helpers.

14. The Company maintains a rather informal transfer policy. When an opening occurs, interested employees notify the supervisor or the supervisor may notify them by a notice of vacancy placed on the bulletin board in the work area. The Company does not require a formal application to transfer from job to job. Upon transfer, the transferee becomes the lowest person on the seniority list within that particular classification. For purposes of vacation and other Company benefits, Company seniority, dating from the Company employment date, prevails.

15. The Company maintains a policy of internal promotion to attract workers. If the Company promotes a man within the line, the promotion creates vacancies all the way down to the entry level. By "promoting from within", the Company can make numerous promotions while adding only one employee. If, instead of promoting from within, the Company hired a person from the outside to come in at the promotion level, the other employees of the Company would be deprived of promotions because the chain would stop at a higher level. As a regulated utility, SWEPCO is unable to pay the high salaries offered by unregulated companies. Thus, the Company feels it can attract a higher quality employee in competition with other prospective employers if it promotes from within. The plaintiffs and intervenor introduced no evidence showing or attempting to show that the policy of promoting from within is applied unevenly to blacks and whites or that the policy tends to lock blacks into unfavorable jobs.

16. Since at least July 31, 1970, SWEPCO has maintained an affirmative action program in hiring and promoting employees. The plan states that the Company will not discriminate in personnel action because of race or color, that managers will provide necessary reports and analysis to monitor hiring and other personnel actions, and that the Company will comply with Executive Order 11246 with respect to its own employees and the employees of its subcontractors. The policy of July 31, 1970, is continued by means of the policy statement of January 7, 1977.

17. The Company maintains an enforcement provision as a part of its affirmative action policy. The enforcement provision from the 1977 policy continues the 1970 terms:

"All supervisory personnel have been and continuously will be advised of the foregoing policy in writing, through the means of oral instructions, conferences, staff meetings, and the like. The Compa-

ny's Vice President-Personnel, Safety and Insurance will have the overall responsibility of supervising and insuring the continuous application and implementation of the Company's policy as hereinabove set out. He will review for compliance with policy stated herein all payroll authorizations requesting the employment, title change, transfer and removal of employees. His initials will indicate acceptance."

There is no clear sanction against supervisors for violating the policy, but each supervisor is evaluated on the basis of implementation of the affirmative action program in his annual progress reports. The Company also has required supervisors to hold weekly meetings with the manager of the Louisiana Division to discuss the importance of equal employment opportunity.

18. SWEPCO actively has attempted to recruit black employees at all levels. The affirmative action policy states that in recruiting the Company will welcome all applicants, will conduct active recruiting drives at all schools and institutes of learning, including those with high minority enrollments, and will publicize job opportunities at career fairs, conferences, seminars, and on company tours to recruit minority applicants. It has established a full-time interviewer to interview applicants who walk into the Company offices off the street. The Company also lists vacancies on the lobby bulletin board in downtown Shreveport where persons pay their electric bills.

19. At the college level, SWEPCO's recruiting efforts are concentrated in the technical and scientific areas. In these areas, the Company has had difficulties attracting black applicants. SWEPCO actively has recruited at Grambling State University, Southern University in Baton Rouge, Prairieview A & M, and Wiley College, all predominantly black institutions of higher learning.

20. SWEPCO also has maintained contact with vocational technical centers at schools in the Shreveport area. It has contacted the principals of the predominantly black high schools in the Shreveport area. In addition, the Company has sent representatives to talk to black students at the schools and centers in assemblies or smaller groups about the opportunities at SWEPCO. The Company has encouraged black students to go forward with their education, especially in the fields of science and mathematics. Also, the Company has contacted the Shreveport-Bossier Vocational Technical Center and the Ayres School of Business, especially requesting those schools to send qualified minority job applicants.

21. SWEPCO has used the services of several other agencies to attempt to recruit black employees. Among these are the Louisiana Department of Employment Security, the Metropolitan Shreveport Personnel Association, the Caddo Community Action Agency and Shreveport Youth Opportunities. It has advertised in the classified advertising sections of *The Shreveport Times* and the *Shreveport Journal* on numerous occasions. All of its ads in those publications have stated that the company is an equal opportunity employer. SWEPCO has not advertised in the *Shreveport Sun*, a weekly paper appealing to a black audience, because the *Sun* does not maintain a classified advertising section for help-wanted ads.

22. Other than the filing of isolated EEOC complaints and this suit, the Company has received no communication from the EEOC expressing dissatisfaction with SWEPCO's progress in hiring or promoting blacks. In addition to the EEOC, SWEPCO falls under the regulation of the General Services Administration (GSA), which is charged with overseeing compliance with Executive Orders in federal contracts. The GSA has never advised SWEPCO that it is not in compliance with the equal opportunity laws. In 1974, 1975, and 1977, agents of the GSA informed SWEPCO that it was in compliance with all affirmative action requirements of the GSA and commended the efforts of SWEPCO under Executive Order 11246.

23. The first witness in the trial was Juanita McKinnie, a research assistant in

the office of the General Counsel of the EEOC. Ms. McKinnie prepared Exhibit P–1, which purported to show a comparison of similarly situated black and white employees of SWEPCO. The exhibit did not purport to compare all blacks and whites employed at SWEPCO. Ms. McKinnie, in preparing Exhibit P–1, compared selected black employees with selected white employees with similar entry dates of service to attempt to show a disparity of income and job assignments among the employees. The exhibit did not contain starting salaries for most of the white employees, and Ms. McKinnie was unable to give any reason for the selection. The selections were not random.

24. On cross-examination, counsel for defendant led Ms. McKinnie to admit numerous problems with Exhibit P–1. Many of the initial pay dates were incomplete; that is, the initial pay for the black employee was the pay of his initial date of service, while the initial pay of the white employee was his pay several years after his initial service date. Also, Ms. McKinnie admitted that there were numerous mistakes in the exhibit.

25. The defendant also attacked Exhibit P–1 through Dr. Arnold Levine, who was presented and accepted as an expert witness in the area of statistics and probability. After examining Exhibit P–1, Dr. Levine found that many of the comparisons were not based on persons of the same educational level or on persons who had been hired at the same time. Moreover, the exhibit compared people in different jobs who were hired at different times. As a statistical expert, he found the figures in Exhibit P–1 to be unreliable. He stated that the method of selecting the figures, by "eyeballing", created a danger of manipulation and made the figures unreliable. He stated that one could not draw any valid statistical conclusion concerning disparity between white and black employees on the basis of Exhibit P–1.

26. The plaintiffs offered no evidence concerning the relevant work force from which SWEPCO could choose its employees. They merely introduced the Standard Metropolitan Statistical Area (SMSA) statistics and asserted that the general population was the available work force for SWEPCO. The figures for the Shreveport SMSA showed that blacks comprise 27 to 32 per cent of the general population.

27. Defendant offered some testimony about the relevant work force. Dr. Levine testified that he did not use the general population in preparing his exhibits because the general population did not represent the work force. He used Tables 175 and 176 of the 1970 Report of the United States Bureau of the Census to determine an approximate percentage of blacks in the work force pertaining to the power industry. He *excluded* from the adult employed population figures those categories of persons that he felt clearly were not pertinent to the power industry. For example, he subtracted lawyers, judges, religious workers and social scientists. In another calculation, Dr. Levine *included* only positions pertinent to the power industry.

28. The plaintiff introduced evidence of the general population, and the defendant introduced evidence about the employed population in certain categories. The general population of the Shreveport SMSA was 32.9 per cent black; in Bossier Parish, the population was 19.7 per cent black; and in Caddo Parish, the population was 36.6 per cent black. Among employed persons, the percentages of black persons were 27.7, 18.2, and 32.7, in the Shreveport SMSA, Bossier Parish, and Caddo Parish, respectively. Neither the plaintiffs and plaintiff-intervenor nor the defendant introduced any evidence about the adult population between 18 and 65 years of age.

29. Dr. Levine's analysis of the labor force pertinent to the power industry shows that blacks comprised approximately 22.4 per cent of the work force that he determined was pertinent to the power industry. Dr. Levine omitted unemployed persons from his figures. That omission is signifi-

cant. For example, if black unemployment is higher than white unemployment, the inclusion of the unemployed in the available work force would increase the percentage of blacks in that work force significantly.

30. At the time of trial, 16 per cent of the 396 employees of SWEPCO's Louisiana Division were black. The work force figures for 1971 through 1977 are shown in Chart I, below:

SWEPCO
Louisiana Division
Total Work Force, 1971–77

|      | White | % White * | Black | % Black * | TOTAL |
|------|-------|-----------|-------|-----------|-------|
| 1971 | 328   | 89.6      | 35    | 9.6       | 366   |
| 1972 | 329   | 88.8      | 37    | 10.0      | 370   |
| 1973 | 348   | 89.2      | 40    | 10.2      | 390   |
| 1974 | 349   | 89.0      | 41    | 10.5      | 392   |
| 1975 | 352   | 86.1      | 55    | 13.4      | 409   |
| 1976 | 345   | 85.0      | 58    | 14.2      | 406   |
| 1977 | 327   | 83.0      | 64    | 16.2      | 394   |

* Percentages do not total 100% because of presence of other races.

Source: EEO–1 Report submitted by SWEPCO to EEOC; SWEPCO's answers to interrogatories.

CHART I

The sources for Chart I were EEO–1 reports submitted by SWEPCO to the EEOC for the years in question. They measure only the static work force at a given point in time. Dr. Levine criticized the approach implicit in the figures presented by Chart I. He said that the raw data presented on such a chart would not be useful. The shortcomings of the chart are that it does not show the number of openings during a given period, it does not show the number or racial identity of applicants, it does not show the number or percentage of applicants hired, and it does not show the number of employees who retired, quit, or where discharged during the period in question.

31. From 1967 to 1977, the black work force at SWEPCO has increased 200 per cent. At the same time, the overall work force has increased less than 25 per cent. Thus, the black work force has increased significantly more than the white work force. Indeed, as Chart I shows, there has been a decline in the white work force at SWEPCO.

32. In preparing his exhibits for the defendant, Dr. Levine tried to compare EEOC categories with the breakdown of the available work force as he defined it to give an accurate picture of the composition of SWEPCO's employment compared to the available work force pertaining to the power industry, as he defined it. Exhibit SL–1 examined total SWEPCO hirings from January, 1971, through June, 1976. By applying the percentages of blacks in the EEOC categories in the available work force, Dr. Levine arrived at the expected number of hires of blacks by multiplying the total number of hires times the percentage of blacks in the available work force. On the basis of exhibit SL–1, Dr. Levine concluded that SWEPCO's hiring practices between 1971 and 1976 were racially neutral. That is, he concluded that SWEPCO either had hired the proper number of blacks during that period or, if it had not met the absolute expected number, the statistical difference was insignificant. Exhibit SL–2 updated Exhibit SL–1 to March 1, 1977. Dr. Levine's conclusions under SL–2 were the same as they had been under SL–1.

33. Dr. Levine also prepared Exhibit SL–3, a comparison of the blacks hired into the work force since 1965 with the available

work force as he defined it. He updated Exhibit SL–3 through March 1, 1977, with Exhibit SL–4. The two exhibits show that between 1971 and March 1, 1977, 26.1 per cent of the new hires at SWEPCO were black. On the basis of the two exhibits, Dr. Levine concluded that the hiring practices of SWEPCO since 1965, and especially since 1971, had no disparate impact upon blacks. He made this conclusion in each category of workers, as well as for the work force as a whole.

34. The Court finds as a fact that the hiring practices of SWEPCO from 1971 through March 1, 1977, resulted in no statistical disparity between blacks hired and whites hired.

35. The only statistics available for high school graduates who applied at SWEPCO were for the year 1976. In that year, less than ½ of 1 per cent of the applicants at SWEPCO were not high school graduates.

36. Dr. Levine prepared Exhibits SL–7 and SL–8 to attempt to show a statistical correlation between the Company safety record and the high school diploma requirement. Exhibit SL–7 was an accident report showing the accidents from 1931 to 1957 and from 1957 to the present. The sequences of occurrences and accidents and their severity showed Dr. Levine that it was very improbable that the sequence was random. After conducting statistical tests on Exhibit SL–8, he concluded that a statistician would reject the hypothesis that the lower accident rate after 1957 preceded by the higher accident rate prior to 1957 was a random occurrence. On cross-examination, Dr. Levine admitted that he could not reach a conclusion as to why the accident rate improved after 1956, but he could state that it was unlikely that the change in the accident rate was due strictly to chance. The defendant showed no cause and effect relationship between the high school diploma requirement and the sequence of accident rates. Without relating the general statistics on accidents to a specific policy, the defendants cannot use Exhibits SL–7 and SL–8 to justify an assertion that the high school diploma requirement caused improvement in the accident rate.

37. Between 1971 and 1977, 49.2 per cent of the black employees taking the "T and D" test passed it. During the same period, 73.6 per cent of the white employees who took the test passed it. The Company, however, did not apply the "T and D" test scores to black employees. Indeed, black employees who failed the test still were promoted to lineman.

38. Since 1973, over 50 per cent of the meter readers hired have been black. All applicants took the SET and had to pass it to become a meter reader. Obviously, there was no disparate impact on black applicants resulting from the test.

39. Dr. Levine prepared Exhibit SL–6 as a statistical comparison of pay for black and white employees. He compiled the exhibit by comparing black and white workers who were hired in the same job at the same time. By Exhibit SL–6, Dr. Levine attempted to determine if there was a pay disparity between white and black employees due either to initial discrimination or to discrimination somewhere up the line of promotion. He found that the average difference in pay was .019 per cent in favor of white employees. He testified that .019 per cent was not significantly different from zero as a matter of statistical application. He concluded that a statistician would accept the hypothesis that the pay differential between black and white employees at SWEPCO is zero; that is, he concluded that there is no statistical disparity in pay between white and black employees hired in the same job at the same time at SWEPCO.

40. Dr. Levine also prepared Exhibit SL–5 to compare black "placement" to white "placement". To make the comparison, he divided the number of black hires plus black promotions by the number of total hires plus total promotions. He concluded that 21.21 per cent of the hiring and promotion decisions had been made in favor of blacks. On the basis of Exhibit SL–5, SWEPCO has demonstrated that there is no statistical disparity between the promotion rates for black and white employees at SWEPCO.

41. Several witnesses for the plaintiffs testified about making application at SWEPCO and being refused employment. However, they presented no evidence that any opening existed at the time SWEPCO denied them employment, or that any white applicants were hired by SWEPCO at that time. In sum, the witnesses made no showing of any different treatment between white and black applicants for employment at SWEPCO.

42. Arthur Lee Henry had a high school diploma and attended two years of college at Southern University. He applied at SWEPCO in 1970. There were no openings in 1970, so he applied again in 1972 or 1973. Mr. Henry testified that Mr. Provenza told him that there were openings but that he could not be hired because of his dress, his attitude, and his incomplete application. Mr. Henry's testimony was inconsistent. His testimony was impeached by questioning about his answer to the same question at his deposition in 1974. In the deposition, Mr. Henry had stated that Mr. Provenza had told him that there were no openings when he applied the second time. Mr. Provenza testified that Mr. Henry's application was incomplete, therefore he did not receive a job. The Court finds the testimony of Mr. Provenza more credible than that of Mr. Henry. Mr. Provenza testified that there were no openings at the time Mr. Henry applied. The Court concludes that SWEPCO failed to hire Arthur Lee Henry because there were no openings at the time he applied.

43. Not a single witness for the plaintiff or plaintiff-intervenor was denied employment at SWEPCO because he lacked a high school diploma.

44. No witness for the plaintiffs or plaintiff-intervenor was denied employment at SWEPCO because he failed a test given after the effective date of Title VII of the Civil Rights Act of 1964. Only one witness failed the employment test and was refused employment because of it. That was James Pannell, who testified that he failed the test in 1964, a year prior to the effective date of Title VII.

45. Of the witnesses who testified concerning their initial job classifications at SWEPCO, only three were hired as janitors. Two of those, Robert Smith and Norman Ellis, had been employed at SWEPCO for 26 years and 20 years, respectively. Any discrimination as to job classification with respect to Mr. Smith or Mr. Ellis occurred many years prior to the effective date of Title VII. Eddie Brown also testified that he was employed as a janitor in 1969. He testified that that was the position he sought and that after he was married he sought a transfer and received it. Other witnesses were employed as meter readers, garage helpers, or warehousemen. Inez Smith first was employed as an electric living consultant. There was no testimony about the initial job classifications of white employees. However, on the basis of the witnesses before the Court, the Court can conclude that there is no pattern of disparate treatment of black employees in initial job assignment.

46. Henry A. Brown was hired on August 11, 1975, as a meter reader. He received steady increases from his starting salary of $450 a month to his salary at the time of trial, $742.82.

47. Charles Hynes came to work for SWEPCO as a meter reader and remained in that position for 3½ years. At that time meter reader was not a union job. The Company required Mr. Hynes' supervisor to conduct an annual examination and interview with Mr. Hynes. Mr. Hynes received good ratings from his supervisor and he told the supervisor that he was satisfied with his job and would not prefer to be doing something else. In 1973, he indicated an interest in doing another kind of job. By April, 1974, Mr. Hynes had moved out into the line of progression. Mr. Hynes moved from garage helper to warehouseman to lineman's helper by December, 1974. After being a lineman's helper for about a year, he was promoted to little truck driver's helper, his present job. Mr. Hynes could point to no white employees who had received better treatment in moving from meter reader through the line of progression toward line-

man. Indeed, he could point both to blacks and whites employed at SWEPCO who had moved more quickly and more slowly within the promotional ranks.

48. Kip Tolliver, a defense witness, came to work at SWEPCO on June 4, 1968, as a meter reader. He gradually worked his way up the line to become a journeyman meter tester. He began work with the Company at $325 a month, and at the time of trial he was making $1,040.60 a month. There is some doubt about Mr. Tolliver's credibility. He stated that he had never filed a charge of employment discrimination, yet he did swear out a complaint against SWEPCO and he filed it with the EEOC. He later withdrew it, explaining that he did not know what he had signed and that when he found out about it he withdrew it. He testified that no one from SWEPCO pressured him or told him to withdraw the complaint.

49. Richard Graham came to work for SWEPCO in October, 1970, as a meter reader. His beginning salary was $450 per month. Mr. Graham began to desire a different job in 1972 and 1973. His supervisor told him there were no other jobs available at that time that paid more than the job he was holding then. Mr. Graham finally transferred out of the meter reader position in April, 1974. Mr. Graham and the plaintiffs produced no evidence that any position was open or that a white employee received a promotion ahead of Mr. Graham. Mr. Graham now is a truck driver, making $916 per month. He testified that he was not qualified to be a journeyman lineman, so that he had progressed up the line as far as he could go without becoming a lineman.

50. James Pannell was hired as a garage helper by SWEPCO. When he was promoted to the line of progression, he was able to choose between utility helper or lineman's helper. He took the lineman's helper job because he felt he would move up the line of progression quicker in that job. After making journeyman in March, 1972, his pay has progressed to $1,217.92 per month. In 1976, with overtime earnings, he made between $15,000 and $16,000.

51. Ricky Moran was hired in 1968 as a garage helper. He progressed from garage helper to storeroom helper to lineman's helper in accordance with his seniority. Now he is a big truck driver, making $916 per month.

52. Norman Ellis Sr. became employed at SWEPCO 20 years ago as a janitor. He still is a janitor. The only job he sought as a transfer was meter reader. On direct examination, the attorney for the EEOC attempted to make a comparison between Mr. Ellis and D. Y. Kennington, a white employee. The comparison was faulty because Mr. Kennington was hired as a journeyman mechanic at the same time Mr. Ellis was hired as a janitor. That they do not make the same salary at present is understandable. The testimony of the Company officials showed that Mr. Ellis had very few job qualifications to move out in the line and that he was not a motivated employee. The Company officials testified that they had attempted to urge Mr. Ellis to improve himself several times but they had been unsuccessful.

53. Robert Smith testified that he had been a janitor at SWEPCO for 26 years. He claimed he was capable of doing the work of garage mechanic. The Company testimony showed otherwise. First, Mr. Smith's supervisor testified that Mr. Smith was a garage helper, not a janitor. He further stated that Robert Smith was not qualified to be a mechanic, lacking the knowledge of engines and the hydraulic systems necessary for mechanic's work.

54. Eddie Brown applied to be a janitor at SWEPCO in 1969. He received the job, and was satisfied with it until after he got married. Shortly after his marriage, in July, 1972, he began to request a transfer. Despite failing the "T and D" test on four different occasions, he was promoted into the line to work toward becoming a lineman. His transfer out of the janitor's position became effective January 2, 1973. He now is a big truck driver, receiving $916 per month.

55. Inez Smith received a B.S. in home economics education from Grambling State

University. She went to work at SWEPCO on April 1, 1970, as an electric living consultant, making $450 per month. She has received several promotions and made $905 per month at the time of trial. Ms. Smith testified adamantly that the Company policies regarding black employees were fair.

56. Ronald McKeel went to work at SWEPCO in 1970 as a warehouseman, with a starting salary of $375 per month. At the time he was hired, his job was not covered by the union contract. However, while he was still there it became a "covered" job. He then learned of a vacancy in the line crew and talked to the union representative about the job. The vacancy, for a lineman's helper, was a covered job when it was posted. Mr. McKeel clearly had union seniority over the other applicant, Phillip Dees, a white employee. The Company promoted Mr. Dees over Mr. McKeel because it felt that Mr. Dees had superior coordination in handling the equipment he would have to handle as a lineman's helper and in driving the Company trucks, a task he would be required to do in other positions on the line of progression. The testimony was clear that Mr. McKeel had difficulty shifting a standard transmission.

57. Mr. McKeel received a promotion to lineman's helper approximately 60 days after the incident involving Mr. Dees. By settling a grievance over the issue, the Company has corrected its seniority rolls to reflect the relative positions of Mr. McKeel and Mr. Dees. Mr. McKeel now has progressed to making $994.73 per month, as opposed to Mr. Dees' $916 per month. The Court finds as a fact that the Company placed Mr. Dees over Mr. McKeel because he was better qualified, not because of his race.

58. Charles Neloms went to work for SWEPCO in May, 1971, as an electrician's helper. He was assigned the task of painting transformers. The Company placed Mr. Neloms on a paint crew so that he gradually might learn electrician's helper's work, but the experiment apparently was not successful.

59. Prior to the time Mr. Neloms was employed, all the painting work done by the Company had been done on contract to other companies. After Mr. Neloms came to work, he got into financial and personal trouble, his attendance deteriorated, he complained frequently, and calls from his creditors commenced. Mr. Neloms ended up in bankruptcy court. One day, Mr. Neloms called in sick and the Company, in checking out his story, discovered that he was not sick. He was terminated shortly after that incident.

60. The testimony of Company officials showed a similar event in connection with a Mr. McAllister, a white employee. Although Mr. McAllister was a good electrician, he began to have personal problems and was absent frequently. One day he called in sick and the Company, in checking on him, discovered that he was not ill. Mr. McAllister was terminated for that reason.

61. Sammie Taylor did not testify at the trial. No other witness for the plaintiff or the defendant testified about or alluded to his claim. The Court, therefore, has no evidence whatsoever of any disparate treatment in connection with the employment of or refusal to employ Sammie Taylor.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter of this action. 28 U.S.C. § 1343(3), (4); 42 U.S.C. § 2000e–5(f)(3). The parties to the action are subject to the personal jurisdiction of the Court. Also, the Court is a court of proper venue. 28 U.S.C. §§ 1391(b), 1393(a); 42 U.S.C. § 2000e–5(f)(3).

2. Section 703(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a), is the heart of Title VII with respect to the employers. Congress has provided, in 42 U.S.C. § 2000e–2(a)(1), (2):

"(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of em-

ployment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

3. The complainant in an employment discrimination case must carry the initial burden of proving a *prima facie* case of discrimination. *Griggs v. Duke Power Company,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Peters v. Jefferson Chemical Co.,* 516 F.2d 447 (5th Cir. 1975). Similarly, in a "pattern or practice" case, the EEOC must establish, by preponderance of the evidence, that racial discrimination was the employer's standard operating procedure, the regular rather than the unusual practice. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Once the plaintiff or the EEOC has shown a present statistical disparity between black and white employees or applicants for employment, the plaintiff has proven a *prima facie* case of racial discrimination. The burden then shifts to the defendant to justify the disparity. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211 (5th Cir. 1974).

4. Generally, the plaintiff in an employment discrimination case need not prove that action was taken with discriminatory intent; rather, the plaintiff need only show the discriminatory effect of challenged practices. *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Peters v. Jefferson Chemical Co.,* 516 F.2d 447 (5th Cir. 1975). In its brief, SWEPCO relied on *General Electric Company v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), to assert that the plaintiff must prove discriminatory intent.

The Court, in *Gilbert,* specifically negated such a holding:

"[O]ur cases recognize that a prima facie violation of Title VII can be established in some circumstances upon proof that the *effect* of any otherwise facially neutral plan or classification is to discriminate against members of one class or another." 429 U.S. at 136–37, 97 S.Ct. at 408 (emphasis in original).

5. The United States Supreme Court illuminated the issue in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977). The Court explained that proof of discriminatory motive is not required when the plaintiff seeks to prove his case under a disparate *impact* theory. Contrariwise, when the plaintiff attempts to show disparate *treatment,* he must prove discriminatory motive, although in some situations he may prove it by the mere fact of differences in treatment. As the instant case relies primarily on evidence of disparate impact, proof of discriminatory motive was not an essential element of the plaintiffs' case.

6. In class action cases involving employment discrimination, the United States Court of Appeals for the Fifth Circuit has recommended, if not required, that the District Court conduct a bifurcated trial. *Swint v. Pullman-Standard,* 539 F.2d 77 (5th Cir. 1976); *United States v. United States Steel Corp.,* 520 F.2d 1043 (5th Cir. 1976). Stage I of the proceedings concerns the liability of the defendant to the class, and Stage II of the proceedings concerns the relief to be granted in case the defendant is held liable. The issues for trial in this case at this stage were only those of the liability *vel non* of SWEPCO.

7. A Stage I proceeding should emphasize the existence or non-existence of broad patterns of racial discrimination by the employer. *Swint v. Pullman-Standard,* 539 F.2d 77, 93 n. 36 (5th Cir. 1976). Stage I should focus on the defendant's broad employment policies and practices and the defendant's rebuttal and business necessity

defenses. *United States v. United States Steel Corp.*, 520 F.2d 1043, 1053 (5th Cir. 1976). The plaintiffs need not show any economic loss during the Stage I proceeding. *Swint v. Pullman-Standard, supra; United States v. United States Steel Corp., supra.*

■ 8. Statistical evidence plays a crucial role in cases of alleged employment discrimination. Statistics alone may establish a *prima facie* case of racial discrimination. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Statistics, however, are neither conclusive nor irrefutable. Their usefulness depends on all the surrounding facts and circumstances. *Id.*

■ 9. Most statistical evidence presented in employment discrimination cases falls into one of two categories. It is either demographic, comparing the work force or hiring statistics for a particular company to the demographic characteristics of the general population, or comparative, comparing performance or hiring or pay between white and black employees of a particular employer. Comparative statistics are the better means of measuring the specific impact of an employment practice. *Pennsylvania v. O'Neill*, 348 F.Supp. 1084, 1087 (E.D.Pa.1972); *Comment, Employment Discrimination: Statistics and Preferences under Title VII*, 59 Va.L.Rev. 463, 470 (1973). Courts have used comparative statistics to evaluate employment tests and other criteria. *See, e. g., Western Addition Community Organization v. Alioto*, 340 F.Supp. 1351 (N.D.Cal.1972). One commentator has stated that while the comparative approach is more reliable, the demographic approach may be needed in some situations:

"Although the comparative approach is generally more reliable than the demographic one and should be a prerequisite of the prima facie case when possible, it does not completely obviate the need for demographic comparisons. The sufficiency of the evidence to establish the prima facie case should depend on the type of statistics introduced by the plaintiff. If differential impact is shown by compara-

tive evidence, the case should be established. If for some reason the comparative evidence is unavailable, unreliable, or inconclusive, the plaintiff may buttress his claim with demographic statistics. In such a case, however, the plaintiff should be prepared to introduce evidence of surrounding circumstances to support his reliance on demographic evidence." *Comment, Employment Discrimination: Statistics and Preferences under Title VII*, 59 Va.L.Rev. 463, 472 (1973).

■ 10. One of the most important determinations in an employment discrimination case is the determination of the relevant labor pool. Evidence of the general population makeup may not reflect the pool of qualified applicants for employment at a particular employer accurately. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339 n. 20, 97 S.Ct. 1843, 1856 n. 20, 52 L.Ed.2d 396 (1977); *Croker v. Boeing Co.*, 437 F.Supp. 1138 (E.D.Pa.1977). Courts have applied their own reasoning to exclude portions of the general population in reaching an appropriate measuring standard for a particular employer in a particular area. *See Rios v. Enterprise Assn. Steamfitters Local 638*, 501 F.2d 622 (2d Cir. 1974); *Badillo v. Dallas County Community Action Committee, Inc.*, 394 F.Supp. 694 (N.D.Tex.1975).

11. At least one court has approved an approach to hiring and promotion statistics nearly identical to the one used by SWEPCO in the instant case. In *Croker v. Boeing Co.*, 437 F.Supp. 1138 (E.D.Pa.1977), Judge Newcomer approved a manpower utilization analysis presented by one of the defendant's expert witnesses. The witness calculated the availability of blacks for particular occupations on the basis of census figures showing the percentage of blacks among persons employed in those occupations. Then he compared the expected utilization of blacks in those occupations with the company's actual utilization of blacks in those occupations. Provided the assumption about the relevant labor pool and the assumptions resulting in the inclusion and exclusion of particular occupations are ac-

curate, manpower utilization analysis is an effective and trustworthy means of determining employment disparities between whites and blacks.

■ 12. In any event, the plaintiff's statistical evidence must show that the allegedly discriminatory practices have a substantial impact on the employment rights of minority applicants or employees. *Griggs v. Duke Power Company,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The plaintiff need not show a racially disproportionate impact of a practice to a mathematical certainty. *James v. Stockham Valves & Fittings Co.,* 559 F.2d 310 (5th Cir. 1977); *Vulcan Society of New York City Fire Department, Inc. v. Civil Service Commission,* 490 F.2d 387, 393 (2d Cir. 1973). In *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the United States Supreme Court held that the plaintiff had established its case based upon a showing of the percentage of minority persons in the population as compared to the gross lack of employees of minority origin in the company.

■ 13. The statistics used to buttress a claim should relate to the particular employment practice at issue. For example, if the plaintiff is attacking hiring policies, he should show the disparity in hiring rather than statistics concerning the general composition of the work force. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Crocker v. Boeing Co.,* 437 F.Supp. 1138 (E.D.Pa.1977).

■ 14. Two recent decisions of the United States Supreme Court have a significant impact on the use of statistical evidence in employment discrimination cases. In *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Court held that a remedy may not be granted for acts of discrimination that occurred prior to the effective date of Title VII of the Civil Rights Act of 1964, July 2, 1965. On the same day, the Court decided *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). In *Evans* the Court stated that any remedy must be based upon an act of discrimination that is still actionable. In the class action context, the only actionable claims would be those that occurred within 180 days of the filing of the earliest charge of discrimination with the EEOC by a named plaintiff. The rationale behind *Teamsters* and *Evans* impels the conclusion that statistics are relevant evidence, but that any statistical disparity to support a *prima facie* case must be shown during time periods relevant to the law suit. Hiring decisions under scrutiny in the action must be actionable decisions. Thus, the Court, in examining statistical evidence, must judge the hiring and promotion statistics, as well as others, from a point in time 180 days prior to the first filing of the charge with the EEOC against the defendant. In this case, SWEPCO must be judged on its performance beginning 180 days prior to November 2, 1973, the date on which Charles Neloms filed his charge of discrimination against SWEPCO with the EEOC.

■ 15. Once the plaintiff has put on his statistical evidence, the defendant may rebut it. He may attack any inference of discrimination by showing that the statistical comparison has not taken into account appropriate qualifications. *Croker v. Boeing Co.,* 437 F.Supp. 1138 (E.D.Pa.1977). He may also challenge the statistics by showing that they are inaccurate or insignificant. *Id.*

■ 16. In attacking a specific practice or selection device, the plaintiff may prove the discriminatory effect of the practice or device by the use of statistics. The plaintiff may shift the burden of proof to the defendant by demonstrating that the practice or device in question has a disparate impact on members of a particular race. *General Electric Company v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). The burden only shifts, however, once the plaintiff has shown the disparate impact of the *particular test or device in question. Albemarle Paper Co. v. Moody,* 422 U.S.

405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *James v. Stockham Valves & Fittings Co.,* 559 F.2d 310 (5th Cir. 1977); *United States v. Georgia Power Co.,* 474 F.2d 906, 911 (5th Cir. 1973). The United States Court of Appeals for the Fifth Circuit has held that the plaintiff may show the statistical disparity of test results by showing that a lower percentage of minority employees were promoted to jobs requiring a certain test score than the percentage of minority workers in the labor pool. *James v. Stockham Valves & Fittings Co., supra.* In *James,* however, the Court relied on *Pettway v. American Cast Iron Pipe Company,* 494 F.2d 211, 221 (5th Cir. 1974). The Court in *Pettway* stated that the testimony showed a cause and effect relationship between the testing and the adverse impact. In other words, the mere disparity, without some causal connection, is not sufficient to shift the burden of proof to the defendant. There must be some proof that the disparity resulted from the practice or device in question. *See United States v. Georgia Power Co.,* 474 F.2d 906, 912 n. 5 (5th Cir. 1973).

17. Title VII does not preclude the use of testing or measuring devices entirely. It only requires that any test or device that has a substantially disparate impact upon a minority group have a demonstrably reasonable relationship to job performance. The test must measure the person for the job and not the person in the abstract. *Griggs v. Duke Power Company,* 401 U.S. 424, 436, 91 S.Ct. 849, 856, 28 L.Ed.2d 158 (1971).

18. The order of proof when a particular practice is challenged has been described by the United States Supreme Court in *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975):

(1) The employee must show that the employment requirement in question selects applicants for hiring or promotion in a racial pattern significantly different from that of the pool of applicants;

(2) The employer then must show that the requirement has a manifest relationship to the employment in question; and

(3) If the employer does show manifest relationship, the employee then may show that other tests or selection devices, without the undesirable racial impact, would also serve the employer's legitimate interest in efficient and trustworthy workmanship.

19. To constitute a "business necessity", and thus relieve the employer of liability for a practice that has a disparate impact on members of a particular race, the business practice must be essential to safety and efficiency. *James v. Stockham Valves & Fittings Co.,* 559 F.2d 310 (5th Cir. 1977); *United States v. Jacksonville Terminal Co.,* 451 F.2d 418, 451 (5th Cir. 1971). There must be no other alternative to achieve the same result as the test in question, and the result desired from the test in question must be essential to the operation of the business in order for the device to constitute a "business necessity". *United States v. Bethlehem Steel Corp.,* 446 F.2d 652, 662 (2d Cir. 1971); *United States v. Jacksonville Terminal Co., supra* at 451 (quoting *Bethlehem Steel*); *Robinson v. Lorillard,* 444 F.2d 791, 798 (4th Cir. 1971). Thus, an employer may not use even a job-related selection device if there is another device available that will accomplish the same result without the undesirable racial impact. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *James v. Stockham Valves & Fittings Co., supra.*

20. In validating particular tests as job-related, the employer must show that the test in question is predictive of or significantly correlated with important elements of work behavior relevant to the job for which the employer does the testing. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 431, 95 S.Ct. 2362, 2378, 45 L.Ed.2d 280 (1975); *United States v. Georgia Power Co.,* 474 F.2d 906, 912 (5th Cir. 1973); *United States v. Jacksonville Terminal Co.,* 451 F.2d 418, 456 (5th Cir. 1971). The criterion selected for validation must be a good measure of job performance. *James v. Stockham Valves & Fittings Co.,* 559 F.2d 310 (5th Cir. 1977); *United States v. City of Chicago,* 549 F.2d 415 (7th Cir. 1977).

21. In the instant case, the Court has no evidence concerning the relevant labor force. The general population is not an adequate figure, as in all likelihood it is too expansive. On the other hand, the restriction of the labor pool for comparison to persons employed in occupations pertinent to the power industry appears to be too restrictive. Thus, the answer lies somewhere in between the 22.4 per cent figure advanced by the defendant and the 32 per cent figure advanced by the plaintiffs. Between 1971 and 1977, a period encompassing the relevant time periods involved in this law suit, 26 per cent of the persons hired by SWEPCO were black. That percentage is very close to the percentage of black persons in the general population, and it is greater than the blacks employed in occupations pertinent to the power industry as defined by Dr. Levine. The Court cannot conclude, on the basis of this evidence, that the hiring practices of SWEPCO since 1971 have had a disproportionate impact on blacks.

22. The plaintiffs produced no evidence at all about the racial impact on whites and blacks of the entrance examination taken by all prospective employees. The Court has no basis on which to conclude that the entrance examination had a disproportionate impact on black applicants. As a result, the burden of proof did not shift to the defendant to validate or justify the entrance examination.

23. The only examination shown to have a potentially disproportionate impact on black employees was the "T and D" examination used to test prospective linemen. The testimony was clear, however, that the Company did not apply any cutoff point to black applicants. Thus, the "T and D" test had no effect shown by statistics on the promotion of blacks to the lineman position. Not a single witness for the plaintiffs was denied advancement to the lineman's progression because he did not pass the test. Thus, with respect to the "T and D" test, the plaintiffs did not prove a disproportionate impact on blacks so as to shift the burden of justification to the defendant.

24. The plaintiffs and plaintiff-intervenor introduced no evidence of disproportionate impact on blacks due to the requirement of a high school diploma. No witness for the plaintiffs was denied employment at SWEPCO because he lacked a high school diploma. In the year 1976, over 99.5 per cent of the applicants to SWEPCO had a high school diploma.

25. The defendant's statistics on the safety records are not reliable to refute a racially disproportionate impact, had one been shown, because the statistics could not relate the safety record to the high school diploma. For the same reason, the plaintiffs failed to prove a disproportionate impact of the high school diploma requirement on blacks because they did not prove any link between the lack of a high school diploma and the refusal to employ any witness or other black person.

26. Of all the witnesses presented by the plaintiffs and plaintiff-intervenor, none hired after 1971 were hired as janitors. The plaintiffs produced no statistical evidence to show discrimination in initial job classification of employees. Thus, because of the lack of statistical evidence and because there was shown no specific instance of discrimination in the initial job classification, the Court must conclude that the plaintiffs have shown no classwide discrimination in job assignments.

27. The only statistical evidence presented by the plaintiffs concerning discriminatory promotion policies was the demographics comparing blacks in certain occupations to the percentage of blacks in the general population. The defendant countered the evidence by explaining that the Company has few turnovers, so that blacks have not progressed to upper levels of management, generally requiring 20 years or more of experience, although they have been hired in appropriate numbers. In addition, the Company presented evidence showing that the promotion policies were racially neutral. The promotion policy at SWEPCO produced no racially disproportionate impact on black employees. Moreover, of the black employees who testified at the trial, nearly every one of them has

**1372**

progressed rapidly up the ranks with numerous promotions and increases in pay. The promotion policies at SWEPCO did not discriminate against blacks.

28. The plaintiffs produced no statistical evidence at all with respect to a discriminatory discharge policy. They presented only the testimony of a single witness. Thus, no class case may be based on wrongful discharge. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

29. Aside from the statistical evidence, which did not prove a disproportionate impact of policies on blacks, the Court can find no pattern or practice of classwide discrimination from the testimony of individual witnesses. The witnesses produced no act of discrimination that would still be actionable. Moreover, the witnesses who were hired were thereafter promoted without regard to race. The Court can find no classwide discrimination by SWEPCO.

30. Individual plaintiff Sammie Taylor presented no evidence whatsoever on any claim of discrimination. Thus, his individual claim must fail.

31. The evidence related in the Court's findings of fact clearly shows that Charles Neloms was discharged for cause, and that a white employee had been discharged for the same reason. This was the only comparison available for Mr. Neloms, and it establishes that he was treated the same as the white employee in the same situation. Thus, SWEPCO did not discriminate against Charles Neloms in his discharge.

32. Named plaintiff Arthur Lee Henry claimed that the Company failed to hire him because he was black. The evidence shows that there were no openings at the time Mr. Henry applied for a position. The Court concludes that SWEPCO did not discriminate against Arthur Lee Henry because of his race in refusing to hire him.

33. The only complaint of Ronald McKeel revolved around his late promotion, relative to the promotion of Phillip Dees. The evidence showed that Mr. Dees had less

seniority but was more qualified for the position due to his greater coordination. Mr. Dees had no trouble handling the large equipment and trucks required for the position while Mr. McKeel had considerable trouble driving the standard transmission trucks. The Court concludes that Mr. Dees was not promoted over Mr. McKeel for an impermissible reason, race, but for a permissible one, qualification.

34. The plaintiffs and the plaintiff-intervenor have shown no classwide discrimination against blacks in hiring, initial job assignment, promotion, or discharge. There must be judgment for the defendant, SWEPCO, against the class and the EEOC.

35. None of the named plaintiffs have shown any discriminatory acts directed against them by SWEPCO. Thus, there must be judgment against each of them personally and in favor of defendant SWEPCO.

## ATTORNEYS' FEES

A District Court may award a prevailing party in an action pursuant to Title VII a reasonable attorney's fee as a part of the cost of the action; the EEOC is liable for attorney's fees just as any other party. 42 U.S.C. § 2000e–5(k). Generally, the same standard applies to awarding attorney's fees to prevailing defendants as it does to prevailing plaintiffs. *United States v. Allegheny-Ludlum Industries, Inc.,* 558 F.2d 742, 744 (5th Cir. 1977).

The defendant shall submit its affidavit of costs, expenses and attorneys' fees, with supporting memorandum, within 21 days of this date. The plaintiffs and plaintiff-intervenor shall respond within 14 days of service of the defendant's submission. The memorandum and the response shall address the award of attorneys' fees to prevailing defendants against private plaintiffs and against the EEOC.

## JUDGMENT

The case having come on for trial before the Court, Honorable Tom Stagg, District Judge, presiding, and the issues having duly been tried, and a decision having duly been rendered,

IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of defendant, SOUTHWESTERN ELECTRIC POWER COMPANY, against intervenor, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION and the plaintiff class of black employees and applicants for employment at Southwestern Electric Power Company's Louisiana Division, dismissing all claims of the plaintiff class and the plaintiff-intervenor on the merits, at the cost of the plaintiff class and intervenor;

IT IS FURTHER ORDERED that there be judgment in favor of defendant SOUTHWESTERN ELECTRIC POWER COMPANY against CHARLES NELOMS, SAMMIE TAYLOR, ARTHUR LEE HENRY and RONALD McKEEL, dismissing their claims on the merits at their cost;

IT IS FURTHER ORDERED that defendant SOUTHWESTERN ELECTRIC POWER COMPANY submit an affidavit of costs, expenses and attorneys' fees, with supporting memorandum of law within 21 days of this date, and that plaintiffs and plaintiff-intervenor respond to the filing within 14 days of the service on them of defendant's submission.