Beverly REED et al.

v.

SISTERS OF CHARITY OF the INCARNATE WORD OF LOUISIANA, INC.

Civ. A. No. 760349.

United States District Court,
W. D. Louisiana,
Shreveport Division.

March 9, 1978.

Frank E. Brown, Jr., Piper & Brown, Shreveport, La., for plaintiffs.

Arthur R. Carmody, Jr., Wilkinson, Carmody & Woods, Shreveport, La., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DAWKINS, Senior District Judge.

*Findings of Fact*

1.

This suit was brought as a would-be class action against the Sisters of Charity of the Incarnate Word of Louisiana, whose correct corporate name now is Sisters of Charity of the Incarnate Word, Shreveport, Louisiana (incorrectly cited as Schumpert Medical Center in the original complaint), a religious, non-profit institution which has furnished medical and nursing services, as well as moral and spiritual guidance, to persons of all races and creeds in this area for more than seventy years.

2.

The action was filed on March 31, 1976, and on June 25, 1976, defendant moved to dismiss the complaint, or, alternatively, to deny class certification pursuant to Rule 23, F.R.C.P. In support of this motion, there was filed a tape recording and transcript of a highly inflammatory speech made by Frank E. Brown, Jr., plaintiffs' lead counsel, to some 150 black persons at the Carver Branch of the Y.M.C.A. in Shreveport. Many of these persons were employed by defendant, and several eventually became plaintiffs in this litigation. The speech was given on February 26, 1976, approximately one month prior to the filing of this suit. Several plaintiffs testified, in discovery depositions, that it was only after hearing this solicitous, highly improper, and unprofessional speech that they decided to join in the suit.

3.

On June 25, 1976, the Clerk's office immediately notified Mr. Brown of this filing, sending him a copy of our Local Rule 10(f) which, in effect, states that, when a motion is opposed, the opposing party shall file his response within ten days after service of the motion. On July 7, 1976, no response of any kind having been filed in opposition to the motion, we caused the following minute entry to be entered in the record of the case:

"Plaintiff, having failed to file a brief in opposition to the motion by 'Sisters of Charity' to dismiss complaint or, alternatively, to deny class certification, within the 10 days required by 10(f) of the Rules of this Court, it is hereby ordered that the alternative motion to deny class certification under Rule 23 F.R.C.P., filed 6–25–76 be and the same is hereby granted."

4.

The remarks made by Mr. Brown at the pre-suit meeting are shown by the tape recording and transcript. They include the following statement:

"I would like to commend all of you on your laudatory effort in your pursuit of suing Schumpert Hospital for alleged employment discrimination . . . ."

"So if there is anything our office can do in supporting your effort, please call upon us."

". . . Schumpert's attorney, Arthur Carmody, who is a damn liar if he says he doesn't discriminate against you at the Schumpert. Carmody is a liar." (Cheering and applause.)

"For those who desire to do 'em [*i. e.,* file charges with the Equal Employment Opportunity Commission] you have to do 'em within 180 days after you think you have been injured by some discriminatory act, otherwise any possible action you have might be barred. So those of you who haven't filed charges and desire to I have thousands of 'em. For those of you who don't want to come to the office and get them you can write off to New Orleans and get some."

"So if there is anything we can do, or you think we might be able to do, to help you, call upon us."

"In no other instance has George D'Artois ever met with any other black employees of this city and we filed over 20 lawsuits for employment discrimination. Without being braggadocio, some have been successful, and others pending in court."

"Any time that you people feel that you have had the most you can take at Schumpert and want to take some affirmative action, call upon us."

Even had Mr. Brown responded to defendant's motion to dismiss, as to the class aspects of this case, we would have dismissed them. His remarks were so unprofessional, inflammatory, and solicitous that we never would have allowed them to serve as a predicate for creating a class.

### 5.

On February 7, 1977, the case, having been put at issue by answer filed, was placed upon the Pretrial Calendar for a Conference on May 11, 1977. However, plaintiffs' attorney failed timely to initiate and file a pretrial order, and on May 4, 1977, in accord with our Local Rules, it was removed by the Clerk from both the Pretrial and Trial Calendars.

### 6.

On October 19, 1977, a new Pretrial and Trial Calendar was issued, setting the Pretrial Conference for January 9, 1978, and Trial for January 16, 1978. The trial commenced as scheduled and was concluded on January 17, 1978.

### 7.

Upon conclusion of all the testimony, a motion was made by defendant, pursuant to rule 41(b) F.R.Civ.P., to dismiss the suit on the grounds that, upon the facts and the law, the plaintiffs had shown no right to relief. For the reasons noted *infra,* we found this motion to be well founded, and judgment was rendered in favor of defendant.

### 8.

Nine named plaintiffs filed this lawsuit: Beverly Reed, Sammie Lee Lewis, Betty Ann Parker, Grady Mae Brown, Lola Pryor, Irma Jean Marlow, Josephine McGaskey, Annie Mae Richardson, and M. L. Brown. However, only six testified at trial. Their claims were frivolous and, indeed, ridiculous. They were totally lacking in merit.

### 9.

Beverly Reed, a black, was a Licensed Practical Nurse (LPN) employed by defendant on January 8, 1974. She initially was assigned to the 11:00 p. m.–7:00 a. m. shift. Her sole complaint was that she requested but was not assigned to the 7:00 a. m.–3:00 p. m. shift, although she alleged other employees with less seniority were assigned that shift.[1]

---

1. The written notations in Mrs. Reed's personnel file reflect that she was given this shift when the second vacancy opened after she requested it. It was shown that the three white

The evidence showed that defendant does not operate on a strict seniority system but that relative ability and qualifications, hospital needs, and experience in certain nursing areas are taken into account when making shift arrangements. Evidence further showed that defendant reasonably attempted to accommodate her several requests for shift assignments: In November of 1974, she accepted a shift change to the 3:00–11:00 p. m. shift on the CICU unit; on March 16, 1975, she requested, and was granted, a change from the CICU unit to the "rotate and float" unit; and, after she requested a permanent 7:00 a. m.–3:00 p. m. shift from the Director of Nursing Services in July of 1975, she obtained the second opening that became available. (The first was filled by a black who had requested it earlier.)

Mrs. Sibyl Wood, the hospital's Director of Nursing Services, testified that Beverly Reed requested and was granted more shift changes than nearly any other employee of the hospital. (Schumpert Medical Center has approximately 1,300 employees, of whom approximately 34 per cent are black.)

We further found Mrs. Reed to be lacking in credibility. She testified that prior to coming to Schumpert she was employed at the Louisiana Ordnance Plant but left because of "a reduction in force." However, written records of the company operating the Plant, introduced at trial, reflected that she quit because of her dissatisfaction with her shift assignments.

Even more determinative of her lack of credibility was her answer on cross-examination that she had been counseled on only one occasion about the quality of her nursing services. Written evidence offered by defendant showed that she had been counseled (criticized) in writing at least a dozen times in less than a two-year period—more than any other employee at Schumpert—except Betty Parker—including:

(1) June 21, 1975—improper charting by B. Davis, R. N.

(2) October 29, 1975—patient complaints made to Sister Rebecca.

(3) November 14, 1975—failure to order medication, according to charts, for patients in her wing, F. McNeill, R.N.

(4) December 1, 1975—poor attitude; not checking off patients' orders, R. McNeill, R.N.

(5) December 1, 1975—leaving floor without permission, Sibyl Wood, R.N.

(6) November 26, 1975—failure to give patient pain medication, S. Wood, R.N.

(7) November 26, 1976—errors in medication, a quite serious violation, Sister Emily.

(8) March 18, 1977—sending patient to anesthesia prior to surgery with dentures in place, a most serious violation, C. Bourgeois, R.N.

(9) March 19, 1977—attempting to "counsel" her superior, J. Wallace, R.N.

(10) March 20, 1977—patient complaints concerning her indifference and attitude, J. Mawry, R.N.

(11) March 21, 1977—medication errors, C. Bourgeois, R.N., and Director of Personnel John Nelson.

(12) On March 23, 1977, she was late for work and then, in a belligerent manner attempted to counsel her superiors, C. Bourgeois and Sister Emily, both of whom are registered nurses. Upon recommendation of Sister Emily, she was discharged that day.

We find that defendant did not unlawfully discriminate against this plaintiff regarding shift assignments and that, indeed, it walked the extra mile in its efforts to rehabilitate her.

employees she complained about had requested the shift prior to Mrs. Reed. Moreover, one had seniority going back to 1968 and another was specially requested for assignment to the shift by a floor supervisor because of her special training and experience in *surgery*.

## 10.

The second plaintiff who testified was Betty Parker, a nurse's aide[2] employed on August 4, 1973. (Her allegations in the complaint admittedly were erroneous—there she alleged she was employed in *1968* as an "orderly.") The gravamen of her complaint was that she was terminated on January 29, 1976, without explanation or reason, due to her race. The evidence overwhelmingly established that she was discharged for cause—a generally poor attitude and substandard job performance. As with Mrs. Reed, she denied any counseling incidents, but written concurrent documentation, as well as the testimony of her supervisors, showed counseling for:

(1) September 20, 1974—leaving floor without consent, by H. Williams, R.N.

(2) September 27, 1974—leaving duty early, by B. Davis, R.N.

(3) September 28, 1974—leaving duty early, by B. Davis, R.N.

(4) October 2, 1974—leaving floor without permission, by B. Davis, R.N.

(5) October 27, 1974—insubordination to supervisor, by B. Davis, R.N.

(6) January 19, 1975—not following instructions, refusal to count pulse, attitude, and insubordination, by V. Putnam, R.N.

(7) May 1, 1975—refusal to help patient with bandaged hand eat meal, B. Davis, R.N.

(8) May 1, 1975—leaving work early without permission, B. Davis, R.N.

(9) August 10, 1975—wearing civilian clothes on duty, poor attitude, by Sister Rebecca.

(10) August 15, 1975—Director of Nursing Services Sibyl Wood called in Mrs. Parker, reviewed her poor work history and advised her that she would be terminated if these complaints continued.

(11) August 18, 1975—she was counseled by Sister Jane because of her insistence on giving a patient a bath while wearing rubber gloves, contrary to all standard nursing practices.

(12) December 8, 1975—counseled by Mrs. Wood regarding patient complaints, insubordination, and not following directions. On the same day, Sister Rebecca, a floor supervisor with over 20 years experience, requested in writing that Mrs. Parker not be re-assigned to her floor. At trial, she testified that this was the first and only such request she had ever made in her long nursing career but that her entire staff—both black and white—would have resigned had Mrs. Parker come back to the floor.

(13) January 29, 1976—Mrs. Parker was discharged on recommendation of Sister Rebecca by Mrs. Wood and Director of Personnel John Nelson.

The claims made by this plaintiff were absurd, unsubstantiated, and the product of sheer imagination. Her work history was replete with acts of misconduct, any one of which would have warranted her being fired on the spot. One of defendant's witnesses, Ann Bolden, testified she attempted specially to assist Mrs. Parker in performance of her duties and warned her she was on "thin ice" and in danger of losing her job. Mrs. Bolden said the decision to terminate Mrs. Parker was in the best interest of the hospital, its patients and employees and that she supported it fully. On cross-examination, she also denied an iota of racial discrimination at Schumpert Medical Center. Mrs. Bolden was a black LPN; now she is an R.N.

Although not binding upon us, it was shown affirmatively by defendant that the Louisiana Department of Employment Security ruled on March 26, 1976, that Betty Parker's discharge was for "misconduct connected with employment."

---

**2.** An aide is an entry-level position in Nursing Services; above this position are Licensed Practical Nurses and Registered Nurses.

We find this plaintiff was discharged for cause, in no way related to her race.

### 11.

Plaintiffs devoted the major part of their case to the testimony of Beverly Reed and Betty Parker, which has been considered in detail above. Their other witnesses were perfunctory and had no substantial complaints; but their allegations and the evidence will be treated fully in order to illustrate the frivolous nature of this entire lawsuit and to support the sanctions which we believe should be applied, not only to attempt to compensate defendant here but to prevent such abuse in the future.

### 12.

Lola Pryor was the third plaintiff to testify. Born in 1931, she completed one year of high school, then began working as a household maid. In 1962, she was employed as a dishwasher by defendant at $130 per month. The following year she requested, and was granted, a transfer to the laundry department where she began as a "folder" and since has acquired the skills to do almost every job in the laundry. She now earns $650 per month.

This plaintiff's sole complaint relates to the fact that one of her friends, hired off the street, obtained a job as a "patient escort." This is a minimum pay, non-skill job; it simply requires some one to wheel or escort patients to various areas of the hospital or to their automobiles at discharge. She testified that late in 1975 she met Director of Personnel John Nelson in the hall and, in passing, said she thought she would like to be a "patient escort." Mr. Nelson, who has had 20 years experience in hospital administration with the United States Army, and over ten years at Schumpert, testified he did not believe she was serious because of the vast pay differential between the two jobs. Nevertheless, on reflection, he called her to his office, explained to her the pay differential between her skilled work in the laundry and the non-skilled requirements of a patient escort. He then asked her if she indeed was serious

in her request to change jobs, to put it in writing and it would be considered. Nothing further was heard from Mrs. Pryor. Her claim was totally frivolous.

### 13.

The next plaintiff to testify was Sammie Lee Lewis, a black female who stated she obtained an accounting degree from Southern University in December of 1975 but was "denied the opportunity to fill out an application or be interviewed by defendant." On balance, these contentions might appear serious; on the merits, however, they proved nothing. Mrs. Lewis did obtain a college degree in accounting from Southern University, and, on a Monday, when she went to pick up her husband who worked as an orderly at Schumpert, she allegedly went to the employment office. Schumpert does not interview for jobs on Mondays; no one remembers her coming; admittedly she never returned, or attempted to fill out an application. She admitted on cross-examination she had applied for a job to over 60 agencies and companies, including all agencies of the federal and state governments in Dallas and Shreveport, all major utility companies in these two cities, plus several dozen banks, as well as a number of insurance companies and private firms, all without success. Moreover, Schumpert showed that, in its accounting department, there are only two positions requiring a degree, one of which was filled in 1962 and the other in 1965, and that there has been no vacancy for an accountant since that time. The evidence convincingly shows this plaintiff was not unlawfully discriminated against by defendant in any respect. This claim is frivolous.

### 14.

The next plaintiff who testified was Irma Marlow. Her sole complaint was that "she has requested several times to be transferred to a permanent floor. Despite her requests she has been denied a transfer and whites have been given the permanent floor." Mrs. Marlow was born in 1945, received a high school education, and, in 1973,

was licensed as a practical nurse by the Shreveport-Bossier Vocational-Technical School. She applied for and obtained employment as an LPN at Schumpert. Mrs. Wood, Director of Nursing Services, testified that, in staffing a large hospital such as Schumpert, it always is necessary to have persons in nursing service (*i. e.*, registered nurses, LPN's, aides, and orderlies) who "rotate" and "float"; that is, who are subject to assignment to different floors and shifts, in order to cover for absences, vacations, weekends, and the like. Shift assignments and schedules are determined by Nursing Services. Both black and white employees rotate and float, as well as others having permanent assignments. Mrs. Wood testified that, with some 725 persons in nursing services, it is not possible always to give each person the shift preference he or she requests but that she attempts to do so consistent with the needs of the hospital.

The written records from Nursing Services showed that the first request made by Mrs. Marlow was on June 22, 1975, when she requested a transfer from the 11:00 p. m.–7:00 a. m. shift on Hall 700 to the Float Unit on the 7:00 a. m.–3:00 p. m. shift. This request was granted. Evidence showed that, while she was working the float unit, she was offered a regular 7:00 a. m.–3:00 p. m. shift in the surgical unit but refused the offer.

On June 22, 1976, a vacancy occurred on the 7:00 a. m.–3:00 p. m. shift in Hall 800. She had advised Mrs. Wood sometime earlier that she would like to have this position if it opened up and, since she was the first LPN to request this position, it was given to her when the vacancy occurred.

Her credibility was weakened by her discovery deposition wherein she testified she was the only LPN who was required to float but, on cross-examination, admitted by name a large number of both black and white LPN's who both "floated" and "rotated."

We find no evidence of any unlawful discrimination with respect to the employment of this witness by defendant. This claim is frivolous.

### 15.

The last of the six plaintiffs who testified was Grady Mae Brown, a nurse-aide with a high school education who was employed by defendant in 1969. She has worked regularly as an aide since that time.

In 1967, she took LPN training at the Vo-Tech Center in Shreveport but failed the examination and never attempted it again. In March of 1976, she received a one-week suspension for leaving her duty area early without permission. By all accounts, she was an average employee.

Her sole complaint was that she sought promotion to the Medical Records Department and was informed there were no openings and was not given that job. Sister Mary Alberic, Director of the Medical Record Department, testified that she never received a request for a job or application by Mrs. Brown but that, even if she had, she would not have been accepted. On cross-examination, Mrs. Brown frankly admitted that she had no typing, shorthand, transcription, or vocabulary skills and was not qualified for a job in medical records. It was shown affirmatively that every employee in this department had these skills when hired.

Her claim, for a position for which she admittedly was not qualified, is frivolous.

### 16.

The remaining plaintiffs, Mary Brown, Joseph McGaskey, and Annie May Richardson, did not testify, and their claims must be denied.

### 17.

Although plaintiffs failed to make any semblance of a case, and we were inclined to grant defendant's motion to dismiss at the end of plaintiff's evidence, we deferred ruling on this motion and required defendant to respond with evidence. This overwhelmingly and conclusively refuted all claims made by all plaintiffs.

### 18.

Without going into excessive detail, defendant established that the religious congregation known as the Sisters of Charity of the Incarnate Word was established by the Bishop of Galveston immediately following the end of the War between The States. Its original members were three young French nuns who founded a hospital and orphanage in Galveston, Texas. From these early days, the Congregation has grown to over 400 professed religious women, all of whom have taken perpetual vows of poverty, chastity, and obedience. They now operate with great success most of the finest health care facilities in Louisiana, Texas, Arkansas, Oklahoma, Utah and in Guatemala and Ireland. Except for this proceeding, the Congregation never has been charged with any type of racial discrimination by either an individual or governmental agency. In this Court's personal knowledge, it was the first medical facility in north Louisiana voluntarily to integrate its facilities, long before that became the law of this land.

### 19.

We were impressed with, and accept as true, the candid, straight-forward testimony of the several religious nuns who testified, such as Sister Agnesita, Sister Rebecca, Sister Alberic, and Sister Emily, all of whom are accredited and experienced nurses and many of whom possess advanced nursing, personnel and hospital administration degrees from some of the leading universities in this country. We also accept them as close adherents to the vows and goals of the Congregation.

For nearly a century they have been among the pre-eminent medical institutions in the southern and southwestern States. They have been in the forefront of acceptance of black patients, granting staff privileges to black physicians, and, foremost in rendering quality patient care to all patients—some 85 per cent of whom are not of the Catholic faith.

### 20.

We also were impressed with, and accept as factual, the uncontradicted testimony of John R. Nelson, Director of Personnel, and Sibyl Wood, R.N., Director of Nursing Services. Each of these individuals is a highly trained, competent professional. Each testified from personal knowledge, as well as from written hospital records maintained in the regular course of business.

Following his graduation from Louisiana Tech University in 1941, Mr. Nelson entered the military and served in increasingly important positions in military hospital management, including personnel work at Brook General Hospital in San Antonio, Texas, and as chief administrative officer of the 28th General Hospital in France. Following his discharge in 1963, he became Director of Personnel at Schumpert Medical Center, the largest private medical facility in Louisiana.

Mrs. Wood was licensed as a Registered Nurse in 1944 and was commissioned immediately in the nurses' corps of the United States Army where she served in various surgical units in combat areas in the South Pacific. Following her honorable discharge by the Army, she served in various nursing capacities in this area and, due to her special skills and expertise, was requested to set up, equip, staff, and train personnel for several small (20- to 30-bed) hospitals in Louisiana and Texas. She later served as chief nurse of the Texas Eastman Plant in Longview, Texas, which is one of the largest companies in this area. Thereafter, she served as director of nursing services at Physicians & Surgeons Hospital in Shreveport, and in 1975 accepted a similar position at Schumpert Medical Center. Her responsibilities include the hiring of all employees in Nursing Services (aides, orderlies, Licensed Practical Nurses and Registered Nurses); continuing education and in-house training of these personnel; matters of discipline and discharge; shift scheduling, and the like. It was clear to us, and actually unchallenged by plaintiffs, that Mr. Nelson and Mrs. Wood are extremely fair, competent, and conscientious in performing their

jobs and none of their decisions relating to any of the plaintiffs here were racially discriminatory.

### 21.

For the foregoing reasons, we find the claims of plaintiffs are insubstantial, indeed, frivolous, and that not a single count of unlawful racial discrimination was proven, even remotely, against defendant.

### Conclusions of Law

### 1.

The Court has jurisdiction over the subject matter of this action. 28 U.S.C. § 1343(3), (4); 42 U.S.C. § 2000e-5(f)(3). The parties are subject to the personal jurisdiction of the Court. The Court is one of proper venue. 28 U.S.C. §§ 1391(b), 1393(a); 42 U.S.C. § 2000e-5(f)(3).

### 2.

Section 703(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), (2):

"(a) It shall be unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

### 3.

Complainants in an employment discrimination case must carry the initial burden of proving a *prima facie* case of discrimination. *Griggs v. Duke Power Company,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Peters v. Jefferson Chemical Co.,* 516 F.2d 447 (5th Cir. 1975).

### 4.

The United States Supreme Court has set forth the standards of proof governing an individual case of employment discrimination in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In addressing itself to the issue of the "order and allocation of proof in a private, non-class action challenging employment discrimination," the Court said:

"The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." [Citations omitted.]

### 5.

If such a showing is made, then the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for the employee's rejection. (*McDonnell, supra.*)

### 6.

As in other civil litigation, the rule of "preponderance of the evidence" is applicable in trial of Title VII and Civil Rights cases, and the burden of proof ultimately is upon the plaintiff to prove the violations alleged. *Barnes v. Lerner Shops,* 323 F.Supp. 617 (S.D.Tex.1971). Furthermore, in order for the allegedly aggrieved party to succeed there must be demonstrated, by the required burden of proof, the fact that such discriminatory practice or policy was the *cause* of the claimed injury. *Gerstle v. Continental Container, Inc.,* 358 F.Supp. 545 (D.Colo.1973).

**7.**

Here there was no burden to shift to defendant because plaintiffs totally failed to prove a case. We find not only no pattern or practice of discrimination but no iota of evidence of a single act of discrimination which would be actionable.

(a) Mrs. *Reed* complained only about her shift assignment. The record shows she requested and was granted any number of shift assignments and received the principal one she wanted when she was next in line for the vacancy. Although her discharge was not an issue in this suit, we note her exceedingly poor work performance record, the many contradictions and inability to recall material transgressions, all of which cast substantial doubt upon her credibility. Thus, defendant did not discriminate against this witness in the matter of shift assignments.

(b) Betty *Parker* claimed she was discharged without cause due to her race. However, we have set forth at some length her long record of substandard nursing performance, her failure to follow instructions, her many warnings and counseling sessions, and finally the floor supervisor's testimony that, if Betty Parker were not terminated, she would lose every employee—black and white—on the floor. The evidence clearly shows she was discharged for cause.

(c) Irma *Marlow,* an LPN, only complained of not receiving a preferential shift assignment. The written personnel records showed that, after she applied for the shift, she obtained the first vacancy which opened. Thus her individual claim must fail.

(d) Sammie Lee *Lewis* had a college degree. She testified she applied for a position in Schumpert's accounting department and was not hired. Even if her testimony were literally correct, there would be no proof of any discrimination, since defendant's evidence showed that there are only two degree positions in the accounting department, both having been filled in the 1960's, and that no one, black or white, degree or no degree, has been hired in that department since the date of her alleged application in December of 1975. The evidence regarding this witness requires further comment: On the day she said she was at Schumpert (a Monday) employment applications and interviews are not given; she admittedly did not return to follow through on her purported application. Of even more significance is the fact that she applied for employment as an accountant at over 60 major companies in the Shreveport and Dallas area, including agencies of the state and federal government, and received not a single job offer.

(e) The claim of Grady Mae *Brown* to move from a nurse's aide position (after failing the LPN examination) into Medical Records, when she admittedly had no shorthand, typing, or transcription skills, is patently frivolous. Sister Alberic testified this plaintiff never formally applied for a position in Medical Records, and, even if she had, she would not have been employed since she was not qualified for the job. Thus her individual claim must fail.

(f) Finally, the claim of Lola *Pryor* to transfer from a skilled position in the laundry, earning $650 per month, to a non-skilled, minimum-pay "patient escort" job is clearly without merit. In fact, Mr. Nelson thought she was making the request in jest—she was told, however, that if she was serious to put the request in writing. Nothing more was heard from her regarding the "patient escort" job. There is no evidence that this plaintiff was discriminated against, and her claim must fail.

(g) The other three individual plaintiffs, Mary Lee *Brown,* Josephine *McGaskey,* and Annie Mae *Richardson,* did not testify. They presented no evi-

dence whatever on any claim of discrimination. Thus their claims must fall. (*Neloms v. Southwestern Electric Power Company, et al.,* 440 F.Supp. 1353, on the Docket of this Court, opinion filed November 23, 1977, page 33, paragraph 30.)

### 8.

Plaintiffs offered no "outside" witnesses. None established any racial bias toward themselves. All (except Sammie Lee Lewis) were hired for the positions they applied for. None could name a higher paying job for which they were qualified and had sought. None testified as to any white employee receiving more pay for the same work. On the other hand, defendants affirmatively showed that there is no disparity in pay, fringe benefits, or working conditions between black and white employees. Although it was not an issue, with respect to the individual claims, the record showed that many blacks were employed at Schumpert Medical Center in supervisory and highly technical medical positions. There was no evidence of any racial discrimination at this institution.

### *Attorney's Fees*
### 9.

The Court may award the prevailing party in a Title VII action a reasonable attorney's fee as part of the cost of the action. 42 U.S.C. § 2000e–5(k). Only one of the plaintiffs, Beverly Reed, was in Court pursuant to 42 U.S.C. § 1981. It now is well established by 42 U.S.C. § 1988 that jurisdiction has been conferred on the district courts:

". . . for the protection of all persons in the United States in their civil rights, *and for their vindication* . . . to furnish suitable remedies . . . in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." (Emphasis supplied.)

This is particularly true where the entirety of plaintiffs' claims are frivolous. This litigation indeed was frivolous, and, indeed, vexatious in the highest degree.

The following citation from *Carrion v. Yeshiva University,* 535 F.2d 722 (2nd Cir. 1976) has special application:

"Appellant's first argument here is that the District Court abused its discretion in awarding Yeshiva counsel fees in the sum of $5,000. There is no doubt that 42 U.S.C. § 2000e–5(k), invoked by the defendant, explicitly provides that 'the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs.' It is not disputed that the prevailing party may be either the plaintiff or the defendant. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 261–62, 95 S.Ct. 1612, 1624, 44 L.Ed.2d 141, 155 (1975).

\* \* \* \* \* \*

This is not the sole rationale, however, since the statute does not limit the award of fees to plaintiffs. Although appellant argues that permitting a prevailing *defendant* an award of attorney's fees discourages the civil rights litigant from initiating litigation and thus frustrates the policy of the Civil Rights Acts, the answer undoubtedly is that the Congressional intention was to encourage responsible litigation *but to discourage baseless or frivolous actions.*" (Emphasis supplied.)

See also *United States v. Allegheny-Ludlum Industries, Inc.,* 558 F.2d 742 (5th Cir. 1977), and the more recent Supreme Court decision in *Christiansburg Garment Co. v. E. E. O. C.,* —— U.S. ——, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).

Also see Judge Hill's opinion in *Goff v. Texas Instruments, Inc.,* 429 F.Supp. 973 (N.D.Tex.1977), where he said:

"When, however, a plaintiff proceeds on a clearly frivolous legal basis, such as suing a private corporation under § 1983 without any contentions of state action, he should be liable for reasonable attorney's fees."

Therefore, attorney's fees and costs in the amount of $2,000.00 will be assessed *in solido* against all plaintiffs.

10.

 This record further clearly reflects that the inflammatory speech of lead counsel on February 26, 1976, approximately one month prior to filing this suit, was instrumental in fomenting this litigation. Because of this conduct, the Court is exercising its discretion and awarding additional attorney's fees and costs in the amount of $2,000.00 against the firm of Piper & Brown.

A suitable judgment should be submitted by defendant's counsel within five days.